**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| DOROTHY A. MOORE-FOTSO, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 12-cv-10419 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| BOARD OF EDUCATION | ) | |
| OF THE CITY OF CHICAGO, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant Board of Education of the City of Chicago's motion for summary judgment [99]. For the reasons set forth below, Defendant's motion [99] is granted.

**I.      Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements: (1) Defendant's Rule 56.1(a)(3) Statement of Undisputed Material Facts [80]; (2) Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts Requiring Denial of Defendant's Motion for Summary Judgment [91]; (3) Plaintiff's Response to Defendant's Rule 56.1(a)(3) Statement of Undisputed Facts [92]; and (4) Defendant's Response to Plaintiff's Local Rule 56.1(b)(3)(C) Statement of Additional Material Facts [102]. The Court construes the facts in the light most favorable to the nonmoving party—here, Plaintiff. Before discussing those facts, the Court turns to the requirements of Local Rule 56.1.

**A.      The Parties' Statements of Facts**

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The "movant's 56.1(a) statement should contain *only* factual

allegations" and "be limited to *material* facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000). The rules require that the movant set forth those material facts in "short numbered paragraphs" that "should contain only one or two individual allegations." L.R. 56.1(a); *Malec*, 191 F.R.D. at 583. "Absent prior leave of Court, a movant shall not file more than 80 separately-numbered statements of undisputed material fact." L.R. 56.1(a).

Local Rule 56.1 also requires the nonmovant to file (1) a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials"; and (2) a statement "consisting of short numbered paragraphs" of additional facts that require the denial of summary judgment. L.R. 56.1(b)(3). "All material facts set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." L.R. 56.1(b)(3)(C). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec*, 191 F.R.D. at 584. Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). Absent prior leave of the Court, the nonmovant is limited to no more than 40 separate statements of additional facts. L.R. 56.1(b)(3). The movant "may submit a concise reply" in response to those additional facts that satisfies the same requirements as the nonmovant's response. L.R. 56.1(b)(3), 56.1(a).

Neither Plaintiff nor Defendant complied with these requirements. Rather than seek leave to file an additional number of "short" paragraphs, each party combined their factual statements into lengthy paragraphs—some as long as 15 sentences. Several statements of

material "fact" include argument and unsupported assertions. "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585. Perhaps because of the length and complexity of the parties' L.R. 56.1 Statements, both parties fail to admit or deny the facts set forth by the opposing side with any consistency. Instead, they repeatedly offer argumentative or evasive responses or obfuscate an admitted fact by burying it among other additional facts. Both parties "move to strike" portions of their opponent's L.R. 56.1 Statement in their responses, lodging evidentiary objections and objections under Federal Rule of Civil Procedure 26. Yet, neither party discusses the import of these objections in their summary judgment memoranda. These tactics violate L.R. 56.1.

Nonetheless, the Court will exercise its discretion in the direction of leniency and consider Plaintiff's and Defendant's 56.1 statements and responses that arguably meet the requirements of the local and federal rules. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction"). The Court carefully reviews the parties' statements of material facts and eliminates from consideration any argument, conclusions, and assertions that are unsupported by the documented evidence of record offered in support of the statement. See, *e.g.*, *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, 2006 WL 980740, *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004). The Court's scrutiny of material statements of facts applies equally to the party seeking summary judgment and the party opposing it. Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court does not consider that statement.

See L.R. 56.1; see also *Malec*, 191 F.R.D. at 583–85. Where a party has denied a statement of fact improperly by failing to provide support for the denial, the Court deems that statement of fact to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec,* 191 F.R.D. at 584. Any statements or responses that contain legal conclusions or argument, are evasive, contain hearsay, are not based on personal knowledge, are irrelevant, are based on declarations from witnesses not properly disclosed under Federal Rule of Civil Procedure 26, or are not supported by citation to evidence in the record are not considered by the Court in ruling on Defendant's motion.

### B. The Facts

Dorothy Moore-Fotso ("Plaintiff") first began working as a substitute teacher for the Board of Education of the City of Chicago ("Defendant") in 1993 and became a full-time teacher in 1996. Plaintiff is certified to teach both general and special education students and has teaching certifications in several math-related subjects. Of relevance to this dispute, Plaintiff taught at John Hope College Preparatory School ("Hope") from at least 2005 through 2008, George Henry Corliss High School ("Corliss") from 2008 through 2010, George Washington High School ("Washington") for 13 days in September and October 2011, and Gwendolyn Brooks College Preparatory Academy School ("Brooks") for nine days in October and November 2011. Since August 2012, Plaintiff has worked as a day-to-day substitute teacher.

Plaintiff also suffers from several chronic medical conditions, including cervical spinal stenosis, asthma, chronic obstructive pulmonary disease, diabetes, and coronary artery disease. According to Plaintiff, she cannot stand or sit for an extended time, has difficulty bending and stooping, has a limited ability to descend and ascend stairs, and cannot be confined to rooms with carpeting or dust. Over the course of her career with Defendant, Plaintiff requested several

accommodations under the Americans with Disabilities Act ("ADA") related to these conditions. This case relates to Defendant's alleged failure to provide one of those accommodations.

### 1. Hope (2005 through 2008)

When Plaintiff worked at Hope between 2005 and 2008, she requested that Defendant provide certain accommodations under the ADA. These included dictation software, a printer, a scanner, two types of projectors, a HP compact business notebook, an ergonomic roller mouse and mouse station, toner cartridges, air purifiers with filters, and use of the school's elevator. [80, at Ex. X, Attach. 1.] Defendant provided all of these accommodations.

For a time at Hope, Plaintiff taught from one classroom. On October 25, 2005, Plaintiff requested an "inclusion"—that is, a teaching schedule that required her to travel between multiple classrooms in a school day rather than be confined to a single "self-contained" classroom. [80, at Ex. W, Attach. 3.] Plaintiff explained that this assignment would "require[] constant movement which facilitates an increase in blood flow and thereby minimize[s] the retention of fluid in [her] feet, legs, heart, and lungs." *Id.* In particular, Plaintiff stated that her primary care physician had advised that "movement is best for my heart" and "[t]o change [her] assignment from inclusion to self-contain would be a determent to [her] health which is a contradiction to the purpose for [her] accommodations." *Id.* In March 2006, Plaintiff was reimbursed for a cart she purchased, which allowed her to move teaching materials such as course books and calculators between classrooms.

On September 19, 2006, Plaintiff requested assignment as a Collaborative Teaching Team ("CTT") teacher at Hope. [80, at Ex. B.] CTT was a national instructional model used in Defendant's schools that enabled general and special education teachers to teach students together in a classroom. Under the CTT model, special education teachers are required to travel

to different classrooms to teach students with learning disabilities. Plaintiff testified that she served as a CTT teacher for special education students at Hope. [See 91, at Ex. 1, 95:22–96:1.]

### 2. Corliss (2008 through 2010)

In July 2008, Plaintiff transferred from Hope to Corliss to work as a general education teacher and was assigned to teach math during the 2008-2009 school year. Her initial schedule required her to teach from five classrooms, but it was later changed to only two rooms. Plaintiff moved her teaching materials between classrooms on a cart and Defendant provided her with a cabinet for storage in at least one classroom. [91, ¶ 14.]

On September 16, 2008, Defendant's Equal Opportunity Compliance Office ("EOCO") sent Plaintiff a letter about her ADA accommodations based on her new assignment to Corliss. [80, at Ex. X, Attach. 1.] The letter stated:

> Since we are not aware of the specifics of your classroom setting at Corliss, please contact this office if you require any new, additional or modified reasonable accommodations to address the limitations cited in your previous requests. Upon receipt, we will initiate the standard interactive process as we have done in the past to determine if a reasonable accommodation can be provided.

*Id.* This letter, however, was sent to Plaintiff's previous address and she did not receive it.

During her first school year working at Corliss, Plaintiff struggled with the requirement that employees demonstrate 98 percent attendance and punctuality. In that year alone, Plaintiff was absent 31 days and tardy 47 days. Corliss' then-principal, Anthony Spivey, sent Plaintiff warnings about her attendance on December 18, 2008, and March 24, 2009. Despite these warnings, Plaintiff's attendance did not improve. Between March 24 and June 5, she was absent 13 days and tardy five days. On June 5, Plaintiff received notice of a pre-disciplinary hearing on her attendance, which was held on June 11. At the hearing, Plaintiff stated "there was no excuse

for the tardiness" but the absences "were due to ADA related illness." [91, at Ex. 50.] Principal Spivey suspended Plaintiff for three days without pay.

At the start of the 2009-2010 school year, Plaintiff continued her assignment as a general education math teacher working from two classrooms. On October 8, 2009, Plaintiff submitted an accommodation request for white boards, a strong steel cabinet, assignment to "one main classroom to avoid moving equipment via cart," an aide to assist with lab cart maintenance, and air purifiers. [91, at Ex. 34.] According to Plaintiff, teaching in one classroom would have allowed her to "maintain and secure her teaching materials," avoid "transporting materials" between classrooms, "set up her air purifiers in the room in the manner that would provide her with the most benefit," have "control over the physical layout of the class" and "her movements in teaching," and have a "safer and more stable environment in which to work." [90, at 4–5.]

The following day (October 9), Defendant sent Plaintiff a letter about her requested accommodations and asked Plaintiff to complete three forms, including a health care provider certification form. [80, at Ex. D.] The letter stated, in bold, underlined, and larger font, that "review of your request will not start until we have received all three [3] completed forms." *Id.* Plaintiff did not submit a health care provider certification form in response to this request. She did send a letter on October 19, 2009, reiterating her requested accommodations and asking Defendant to let her know if it needed "additional medical documentation to replace prior accommodations." [91, at Ex. 35.]

Despite not receiving Plaintiff's health care provider certification form, a representative from the EOCO engaged with Plaintiff about her accommodations. Plaintiff was provided with air purifiers in each classroom where she worked, whiteboards, overhead projectors, filing cabinets (although Plaintiff argues these cabinets were not "secure," as she requested), and

elevator access. When the laptop that Defendant provided as an accommodation required repairs in January 2010, Defendant took steps to repair it. [92, at Ex. E.] Plaintiff also purchased a task chair and cart for herself, which she continued to use to move materials between classrooms. Plaintiff was not, however, granted an accommodation to work from one main classroom.

In November 2009, Plaintiff was assigned to teach CTT math classes as a special education teacher. At first, Plaintiff's CTT schedule required her to travel between two classrooms approximately 259 feet apart on the same floor. In December, her teaching schedule changed and she was assigned to three classrooms on two different floors. On January 4, 2010, her schedule changed again and she was assigned to more than five classrooms per day—all on the second floor. In her response, Plaintiff states, "[a]lthough it was not a one-room setting, [she] would have been satisfied to remain in the regular education math position she occupied prior to the transfer to the CTT position." [90, at 9.]

On January 21, 2010, Plaintiff submitted a note from her doctor explaining that Plaintiff "has difficulties navigating stairs, antalgic gate secondary to pain [walking in a certain way to avoid pain] and cannot stay seated or stand for prolonged periods." [80, at Ex. W, Attach. 1.] The physician requested that Plaintiff be allowed to "vary her seated/standing positions" and that Defendant "consider these conditions to make accommodations." *Id.* The letter did not specifically reference an accommodation to teach from one classroom or arrive late to work.

Plaintiff, however, continued to miss work at Corliss in the 2009-2010 school year. Between September 29, 2009 and February 1, 2010, Plaintiff was tardy 19 times and absent 13 days. On February 9, 2010, Principal Spivey sent Plaintiff a notice for a pre-disciplinary hearing. At her March 4, 2010 hearing, Plaintiff stated that "her preexisting medical condition [was] complicated by a change in schedule [that] caused her to be absent and tardy to work."

[80, at Ex. E, Attach. 6.]  She further explained that "her condition has changed now that she has the proper equipment provided through [the] ADA" and "her attendance and punctuality has improved."  *Id.*  Principal Spivey issued a five-day suspension without pay, which Plaintiff appealed.  At the May 4, 2010 hearing on her appeal, Plaintiff stated that Defendant, "through the Americans with Disabilities Act[, had] provided air purifies for the school which has caused her health to improve" and that "as a result of her improved health, her attendance and tardiness has also improved."  [80, at Ex. E, Attach. 7.]  Principal Spivey pointed out that in between her March 4 and May 4 hearings, Plaintiff was absent an additional five days and tardy an additional eleven times.  *Id.*  Accordingly, the panel upheld Plaintiff's suspension.  Plaintiff received another pre-disciplinary hearing notice for the fifteen times she was tardy between March 4 and May 17, was suspended for ten days without pay, and appealed again.

On May 3, 2010, Plaintiff's physician sent Defendant a health care provider certification form as part of a request for time off under the Family and Medical Leave Act ("FMLA").  [80, at Ex. Y.]  Under "job functions the employee is unable to perform," the certification listed "prolonged walking, standing, sitting."  *Id.*  The certification also stated that Plaintiff could not "ambulate due to pain, shortness of breath, and weaknesses of legs" during "flare-ups" of her condition.  *Id.*  On May 13, Defendant granted Plaintiff's FMLA request to be absent for up to four days each month, which she could take as either full or partial days off.  [80, at Ex. H.]

As part of Plaintiff's annual performance review, Principal Spivey observed Plaintiff's classroom performance on May 13, 2010.  That day, Plaintiff arrived late to class and did not engage in instruction when she arrived.  Instead, she "sat, doing nothing, for a while."  [80, ¶ 21.]  Principal Spivey stated that he "saw no evidence of lesson plans or establishing a positive learning expectation for all the students and no evidence of cooperative teaching or [P]laintiff's

applying contemporary principles of learning theory and teaching methodology." *Id.* ¶ 20. He thought "there was very little attempt to support the students while [Plaintiff] was in the classroom," and even observed a confrontation between Plaintiff and another teacher. *Id.* ¶ 21. On May 17, Corliss' assistant principal also observed Plaintiff's classroom performance and concluded that she was not providing "differentiating" instruction—a requirement for teaching students with disabilities with individualized learning needs. *Id.* ¶ 24. The assistant principal relayed these observations to Principal Spivey.

On June 1, 2010, Plaintiff received a teacher evaluation rating of "unsatisfactory" for the 2009-2010 school year. Her evaluation states that her "weaknesses" were (1) "Applying contemporary principles of learning and teaching methodology consistently"; (2) "Actively engages in school-wide professional development"; (3) "Sets standards for quality student work"; (4) "Exhibiting appropriate classroom management skills"; (5) "Clearly produces intended or desirable assessment results"; (6) "Does not maintain her attendance/punctuality in accordance with our local unit criteria"; and (7) "Consistently carry out daily routines and administrative request." [80, at Ex. E, Attach. 13]. Four other Corliss teachers, none of whom had requested accommodations for a disability, also received an "unsatisfactory" rating that year.

On June 15, 2010, Plaintiff provided Defendant with a two-paragraph letter from her physician stating that Plaintiff was suffering from an "exacerbation of her chronic conditions," which "occurred due to lack of appropriate accommodations at work as recommended previously." [80, at Ex. AA.] The letter further stated that "[i]n order for the patient to perform her job duties with a substantial decrease in the number of days absent and/or tardy, the patient needs to have a work location in one classroom on the first floor." *Id.* The last day of the school year was June 18, 2010.

On June 23, 2010, Defendant adopted a city-wide resolution governing teacher layoffs. The resolution provides that schools were first required to lay off teachers lacking proper certifications and teachers rated "unsatisfactory" before considering teacher seniority. [80, at Ex. O, Attach. 1.] Due to a budgetary crisis, Defendant laid off over one thousand teachers that year. [102, at Ex. CC, ¶ 4.] When Corliss' budget for the upcoming year provided for two fewer special education teacher positions, Plaintiff and another teacher rated "unsatisfactory" were terminated. Her dismissal became effective on August 3, 2010.[1] [91, at Ex. 53.] Plaintiff was told that her position had been terminated for "economic reasons" [102, at Ex. CC, ¶ 3], and she admits that she "was chosen for layoff because she was in a position that lost population and Dr. Spivey had given her an 'unsatisfactory' rating for the 2009-10 school year." [91, ¶ 31.]

### 3. Reassigned Teacher Pool (2010-2011)

On August 26, 2010, Plaintiff filed a grievance regarding her termination with Defendant's Office of Employee Relations ("OER"). Plaintiff then filed a charge of discrimination against Defendant with the Equal Employment Opportunity Commission ("EEOC") on November 8, 2010. [91, at Ex. 63.] In her EEOC charge, Plaintiff claimed that "during the 2009-2010 school year * * * [Plaintiff requested] accommodations for her disability * * * [including] allowing her to teach her students and classes in one classroom on the first floor of the building * * * [and] to start her first class no earlier than second period." *Id.* The charge states that Defendant refused to accommodate Plaintiff's disability and "gave her an unsatisfactory performance evaluation based on alleged deficiencies that were either false, or due to [Defendant's] refusal to accommodate [Plaintiff]." *Id.* She also claimed that Defendant refused to accommodate her "as well as suspending her and lowering her performance

---

[1] On September 1, 2010, Defendant advised Plaintiff that the appeal of her ten-day suspension from May would be terminated and she would not be suspended because she was no longer an active Chicago Public School employee.

evaluation," which were done "in retaliation for [Plaintiff] having previously filed a charge of discrimination with the EEOC." *Id.* This "previous[]" charge refers to a 2004 EEOC charge that Plaintiff had filed against Defendant, which the parties settled on May 5, 2004. [102, at Ex. PP.]

On December 15, 2010, the OER assessed Plaintiff's August 26 grievance and determined that Corliss' special education teacher budget had decreased, in fact, because its special education student population had declined. Under the terms of the Chicago Teachers Union's collective bargaining agreement ("CBA"), teachers displaced because of a decrease in student enrollment (rather than "economic reasons") should be assigned to the Reassigned Teacher Pool ("RTP") as full-time employees with full benefits. As a result, Plaintiff was retroactively reinstated in the RTP and provided with back pay to September 1, 2010. Pursuant to a settlement agreement between Defendant and Plaintiff's union on her behalf in February 2011, Plaintiff's teacher rating was changed from "unsatisfactory" to "no rating" and Plaintiff released Defendant of "all claims or causes of action" related to her grievance. [91, at Ex. 60.]

Under the CBA, teachers are assigned to the RTP for ten school months unless they are able to find a permanent job sooner. [91, at Ex. 11, App. H, § 7(B).] RTP teachers are provided with paid excused absences to search for work in their first 30 school days in the pool. *Id.* § 5. If a teacher is unable to find permanent employment during his or her ten-month RTP assignment, the teacher is laid off, given an "honorable termination from service and the opportunity to be placed as a Cadre substitute." *Id.* § 10.

Plaintiff received excused absences for January 10, 2011, through February 22, 2011 [80, at Ex. S], and was unable to secure permanent employment during the ten-month period covering her retroactive reinstatement to the RTP in September 2011 through June 2012. This inability stems, in part, from the fact that Plaintiff was injured in a car accident on February 1, 2011.

After this accident, Plaintiff's physician would not release her to work until after she had surgery. [102, at Ex. GG.] On May 26, 2011, Plaintiff was notified that she would be honorably terminated from the RTP effective June 24, 2011, and authorized to work as a Cadre substitute.

### 4. Cadre Status: Washington and Brooks (September-November 2011)

Cadre substitutes are teachers who "move from school to school to cover temporary vacancies on a daily basis." *Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1057 (7th Cir. 2008). Under the CBA, "Cadre substitutes shall be continuously available to perform substitute service" and "shall accept assignments in any and every school." [91, at Ex. 11, Art. 27-1.1.]

Plaintiff's first assignment as a Cadre substitute was to Washington, where she worked for thirteen school days from September 6, 2011, to October 5, 2011. Plaintiff testified in her deposition that she relayed her request to work in one classroom on the first floor to officials at EOCO and Washington, but this accommodation was not provided. Instead, she was provided with a cart to transport her teaching materials between classrooms. Plaintiff taught at least one math class, attended at least one math department meeting, and was observed teaching math by Washington's assistant principal. For part of her time at Washington, Plaintiff also performed administrative functions.

During Plaintiff's assignment to Washington, Washington Principal Florence Gonzales hired two math teachers. Both newly hired math teachers were assigned to more than one classroom on two different floors. [102, at Ex. FF, Attach. 1; 91, at Ex. 3, 45:5–14.] The parties dispute whether Plaintiff was told about the math positions prior to her assignment to Washington. Ms. Gonzales testified that she was unaware that Plaintiff was certified to teach math and did not have Plaintiff's resume. According to Plaintiff, at least one math teacher at

Washington was assigned to only one classroom.   In addition, Washington had one tenured teacher with a disability who was provided with a one-room accommodation.

After Washington, Plaintiff's second assignment as a Cadre substitute was to Brooks, where she worked for nine school days through November 30, 2011.   Plaintiff was initially assigned to teach general education math.   She was later assigned to teach in a trainable mentally handicapped setting in one classroom on the first floor.   Because this room was carpeted, however, Plaintiff was unable to continue working out of this room.

Plaintiff did not report to work as a Cadre substitute for the remainder of the school year.   On July 9, 2012, Plaintiff filed a second charge of discrimination with the EEOC.[2]   [21, at Ex. 2.] On August 3, 2012, Plaintiff was told that her Cadre status would end on August 31 and she would be placed in the day-to-day substitute pool as of September 3, 2012.   [91, at Ex. 71.]

## II.   Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a).   To establish that a material fact is undisputed, the movant "must support the assertion by * * * citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations * * *, admissions, interrogatory answers, or other materials."   Fed. R. Civ. P. 56(c)(1).   In determining whether summary judgment is appropriate, the court should construe all facts and reasonable inferences in the light most favorable to the non-moving party.   See *Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014).   Rule 56(a) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against any party who fails to make a showing sufficient to

---

[2] The charge itself is stamped with a "received" date of August 6, 2012 [see 21, at Ex. 2], but both parties treat the charge as if it was "filed" in July.   [See 79, at 26; 90, at 29.]

establish the existence of an element essential to that party's case, and on which that party would bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Put another way, the moving party may meet its burden by pointing out to the court that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

To avoid summary judgment, the opposing party then must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). For this reason, the Seventh Circuit has called summary judgment the "put up or shut up" moment in a lawsuit—"when a party must show what evidence it has that would convince a trier of fact to accept its version of events." See *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003) (citation omitted). The "mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

Plaintiff's First Amended Complaint asserts three claims under the ADA: (1) failure to accommodate (Count I); (2) disability discrimination (Count II); and (3) retaliation (Count III). [21, at 9–13.] These three claims turn in varying degrees on Defendant's failure to provide Plaintiff with one classroom on the first floor of a school. Her complaint also asserts a fourth claim for Intentional Infliction of Emotional Distress ("IIED") [*id.* at 13–14], but she declines to pursue that claim further [90, at 1 n.1]. Accordingly, the Court grants summary judgment for Defendant on Count IV, Plaintiff's IIED claim.

"The ADA prohibits employers from taking adverse employment actions against their employees because of a disability." *Fleishman v. Cont'l Cas. Co.*, 698 F.3d 598, 606 (7th Cir. 2012); see 42 U.S.C. § 12112(a). An employee may state a claim for discrimination under the

ADA by advancing either (1) a failure to accommodate theory—that is, the employer failed to provide a reasonable accommodation for the employee's disability—or (2) a "disparate treatment" theory—that is, the employer treated the employee differently *because of* her disability. *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). Plaintiff advances both theories in her Counts I and II, respectively.

To establish a violation of the ADA, the employee must prove "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Winsley v. Cook Cnty.*, 563 F.3d 598, 603 (7th Cir. 2009) (citation omitted). "To survive a motion for summary judgment, a plaintiff must present the court with evidence that, if believed by a trier of fact, would establish all three elements of [her] claim." *James v. Hyatt Regency Chi.*, 707 F.3d 775, 782 (7th Cir. 2013). For purposes of summary judgment here, Defendant does not contest that Plaintiff is disabled within the meaning of the ADA. [79, at 14 n.5.] "However, having a disability does not end the inquiry." *Curry v. City of Chi.*, 47 F. Supp. 3d 797, 803 (N.D. Ill. 2014). "No matter the type of discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that he was 'a *qualified individual* with a disability.'" *Sieberns*, 125 F.3d at 1022 (emphasis added). It is to this element of Plaintiff's prima facie case that the Court turns first.

A.    **"Qualified Individual"**

Under the ADA, a "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The

employee must "pass a two-step test" to be a "qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, *etc.*'" *Id.* (quoting 29 C.F.R. app. § 1630.2(m)). "Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id.* (quoting 29 C.F.R. app. § 1630.2(m)). Again, "the burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dept. of Corrs.,* 107 F.3d 483, 484 (7th Cir. 1997).

The Seventh Circuit has "repeatedly held that an employee who does not come to work cannot perform the essential functions of his job." *Fogle v. Ispat Inland, Inc.*, 32 F. App'x 155, 157–58 (7th Cir. 2002); accord *Byrne v. Avon Prods., Inc.,* 328 F.3d 379, 381 (7th Cir. 2003); *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927–28 (7th Cir. 2001); *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899–900 (7th Cir. 2000); *Waggoner v. Olin Corp.,* 169 F.3d 481, 483 (7th Cir. 1999).[3] This regular attendance requirement applies equally to teachers. See *Nowak v. St. Rita High Sch.,* 142 F.3d 999, 1003 (7th Cir. 1998) (holding that "[a teacher] who does not come to work cannot perform the essential functions of his job"); *Preddie v. Bartholomew Consol. Sch. Corp.*, 799 F.3d 806, 814 (7th Cir. 2015) (holding that Plaintiff's "twenty-three absences prevented him from performing the essential functions of his teaching

---

[3] Courts outside the Seventh Circuit follow a similar rule. See, *e.g.*, *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 420 (6th Cir. 2004) ("the record is replete with evidence of plaintiff's excessive absenteeism, which rendered him unqualified"); *Epps v. City of Pine Lawn*, 353 F.3d 588, 593 (8th Cir. 2003) ("Attendance at work is a necessary job function. An employee who is unable to come to work on a regular basis [is] unable to satisfy any of the functions of the job in question, much less the essential ones." (citation and internal quotations omitted)); *Rogers v. Int'l Marine Terminals, Inc.,* 87 F.3d 755, 759 (5th Cir. 1996) ("Because [the plaintiff] could not attend work, he [was] not a 'qualified individual with a disability' under the ADA."); *Carr v. Reno,* 23 F.3d 525, 530 (D.C. Cir. 1994) (holding that "coming to work regularly" is an "essential function"); *Tyndall v. Nat'l Educ. Centers,* 31 F.3d 209, 213 (4th Cir. 1994) ("An employee who cannot meet the attendance requirements of the job at issue cannot be considered a 'qualified' individual protected by the ADA.").

position," and as a result, "he is not a qualified individual"); see also *Tyndall*, 31 F.3d at 213 (holding that plaintiff's "frequent absences rendered her unable to function effectively as a teacher" where she missed "almost forty days of work during a seven-month period").

Plaintiff does not dispute that her attendance was an essential function of her job. The question, therefore, is whether she can show that she could perform this essential function "as of the time of the employment decision." *Nowak,* 142 F.3d at 1003. In other words, Plaintiff must present sufficient evidence that a reasonable jury could find she was "willing and able to demonstrate the[] skills [necessary to perform her job] by coming to work on a regular basis" at the time she was rated "unsatisfactory"—the event triggering her termination from Corliss. *Id.*

Plaintiff fails to do so. Plaintiff fell far short of the requirement that Corliss employees "demonstrate 98% attendance and punctuality." [80, ¶ 17.] For over two school terms, Plaintiff cycled through a pattern of excessive absences and tardies, followed by warnings and discipline, followed by further absences and tardies. She was absent or tardy 78 times her first year and 52 times her second year. Her poor attendance rate persisted in spite of her numerous accommodations. "When an employee is unable to perform the essential function of attending his employment, few, if any, reasonable accommodations exist." *Amadio*, 238 F.3d at 928 (holding that plaintiff's "23 medical leaves during his last three years of employment" and the fact that he was "disciplined several times in connection with his absenteeism" meant he "do[es] not qualify for protection under the ADA"); *Jovanovic*, 201 F.3d at 899–900 (holding that plaintiff's 24 absences in 12 months disqualified him as a "qualified individual" under the ADA). Given Plaintiff's longstanding history of absences and tardiness, "there was literally nothing in the record to suggest that the future would look different from the past" and Plaintiff would reliably attend work in the future. *Corder v. Lucent Technologies, Inc.,* 162 F.3d 924, 928

(7th Cir. 1998).  In light of these facts, Plaintiff not satisfied her burden of establishing that she is a "qualified individual" under the ADA.  See *E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 950 (7th Cir. 2001) ("After reviewing the record and considering [the employee's] poor attendance record, we are convinced that [the employee] was unable to, and failed to, satisfy his burden of establishing that he is a 'qualified individual' under the ADA.").

Plaintiff argues that she is a "qualified individual" notwithstanding her attendance problems because "it was Defendant's failure to accommodate Plaintiff that was the cause of her absences and tardiness" and "Defendant cannot now benefit from its illegal behavior" by arguing that Plaintiff was "unable to go to work."  [90, at 23.]  There are several problems with this argument.  First, "the ADA does not protect individuals who fail to show up for work, *even when their absences are a result of a disability*."  *Fogle*, 32 F. App'x at 157–58 (emphasis added); accord *Waggoner*, 169 F.3d at 484 ("in most instances the ADA does not protect persons who have erratic, unexplained absences, even when those absences are a result of a disability").[4]  This rule applies even where an employee asserts that her employer's failure to accommodate led to her attendance issues, as Plaintiff does here.  See, *e.g.*, *Key v. U.S. Steel Corp.*, 2014 WL 772607, at *7 (N.D. Ind. Feb. 25, 2014) (rejecting plaintiff's argument that "Defendant's refusal to accommodate his temperature restrictions caused him to have the [insulin] pump removed,

---

[4] The Seventh Circuit has "drawn a distinction between an employee's disability and workplace misconduct resulting from that disability," holding that "an employee's disability will not preclude an employer from imposing discipline, up to and including discharge, for the employee's violation of a workplace rule, even when there is a connection between the disability and the violation." *Tate v. Ancell*, 551 F. App'x 877, 885 (7th Cir. 2014). *Tate* cites in part to *Waggoner*, which confirms that absenteeism is encompassed within *Tate*'s use of the phrase "workplace misconduct." *Tate* further distinguishes *Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128 (9th Cir. 2001), as an example of a circuit that has not "drawn the same distinction that we have between an employee's disability and workplace misconduct that results from the disability." *Tate*, 551 F. App'x at 885. Accordingly, Plaintiff's reliance on *Humphrey* for the proposition that "where there is a link between absenteeism and the plaintiff's disability, she was fired *because* of her disability" is misplaced. [90, at 24–25.]

which in turn made it impossible for him to manage his diabetes and led to the absences that the Defendant used to terminate his employment").

Second, Plaintiff's 31 absences and 47 tardies from the 2008-2009 school year predate her first documented request for a one-room accommodation on October 8, 2009.[5] In fact, Plaintiff conceded that "there was no excuse for the tardiness" at her June 11, 2009 disciplinary hearing. [91, at Ex. 50.] "[A] plaintiff must normally request an accommodation before liability under the ADA attaches," and Plaintiff cannot now claim that Defendant's failure to provide her one classroom caused her absences before she had even requested it. *Jovanovic*, 201 F.3d at 899.

Third, Plaintiff simply fails to present any evidence that Defendant's refusal to provide her reasonable accommodations was "the cause" of her poor attendance. [90, at 23.] In fact, the undisputed evidence suggests the opposite. Plaintiff states that instead of being transferred to the CTT position in 2009, she "would have been satisfied" to remain as a non-CTT teacher who was "not in a one-room setting." [90, at 9.] That, of course, was the same position she held when she was absent 31 days and tardy 47 times. Thus, Plaintiff failed to attend work regularly even when provided with an accommodation that she admits would have "satisfied" her.

Focusing on her 18 absences and 34 tardies in the 2009-2010 school year, Plaintiff does not identify any time prior to June 1, 2010—the date on which Principal Spivey rated her

---

[5] Plaintiff testified that she first requested one classroom in 2004 [90, at 5], but provides no evidence to substantiate that assertion. Even if credited, her October 25, 2005 accommodation request for an "inclusion" teaching position and her September 19, 2006 accommodation request to be assigned as a CTT teacher indicate that she abandoned her one-room request before reasserting it in October 2009. Plaintiff also argues that she transferred to Corliss in 2008 "to be placed in a regular (or general) education position," and Principal Spivey "told her that she would teach from one room." [91, ¶ 12.] Because Defendant disputes Plaintiff's characterization of this conversation, Plaintiff argues that this presents an "issue of material fact." [90, at 6 n.11.] The testimony that Plaintiff relies on to generate this dispute does not help her. Specifically, when Plaintiff described the conversation where Principal Spivey "promised [her] that [she] could teach math in one room," Plaintiff testified that "When the question was directed to Spivey, I said, well, how many rooms does a math teacher use here. He said, they teach in one room. And I said, oh, okay. And I left it like that." [91, at Ex. 1, 102:6–17.] Even in the light most favorable to Plaintiff, this testimony not show that she requested one classroom as an ADA accommodation or that Principal Spivey "promised" it to her.

"unsatisfactory"—where she connected her attendance problems with her lack of a one-room accommodation specifically. At the time, she attributed her absences to her "medical condition" and explained that "her attendance and punctuality ha[d] improved" only because Defendant had provided her with accommodations "through the Americans with Disabilities Act." [80, at Ex. E, Attachs. 6 & 7]; see *Fogle*, 32 F. App'x at 157–58; *Nowak*, 142 F.3d at 1003 (holding that a teacher's self-serving claim that he was "ready to return to his teaching position" was "insufficient to raise a material issue of fact as to his ability to come to work on a regular basis prior to [his employer's] decision to terminate him"). Moreover, Plaintiff never requested excused absences as an ADA accommodation. When she first requested excused absences for these medical conditions in her May 3 FMLA request [80, at Ex. H], Defendant promptly *granted* that request. Plaintiff does not engage with these facts or explain how they show that it was Defendant's refusal to accommodate her that caused her *unexcused* absences.

The only evidence that links Plaintiff's request for a one-room accommodation and her attendance is her physician's June 15, 2010 letter [80, at Ex. AA], which asserts that Plaintiff's conditions were "exacerbat[ed] * * * due to a lack of appropriate accommodations at work as recommended previously" and "[i]n order for [Plaintiff] to perform her job duties with a substantial decrease in the number of days absent and/or tardy, [Plaintiff] needs to have a work location in one classroom on the first floor." This cursory letter does not state that the failure to provide one classroom had been the cause of Plaintiff's *past* absences or substantiate this assertion in any way. Instead, it offers only the vague, legalistic conclusion that Plaintiff had not received "appropriate accommodations," and speculates that providing one classroom would "substantially decrease" Plaintiff *future* absences—implying that some number of absences would continue even with this accommodation. See *Weigel v. Target Stores*, 122 F.3d 461, 468–

69 (7th Cir. 1997) (affirming summary judgment and concluding that physician's statement that "there was a good chance" plaintiff would be able to return to work following leave was "too conclusory and uninformative" to support the conclusion that accommodation would have been successful); *Basden v. Prof'l Transp., Inc.*, 714 F.3d 1034, 1038 (7th Cir. 2013) (affirming summary judgment because plaintiff's evidence that medication improved her condition and she hoped for "enough improvement" after leave to return to work "regularly" was "insufficient to support a factual finding that [the plaintiff] was able to come to work regularly at the time of her termination"). Even so, this letter is dated two weeks after Principal Spivey rated her "unsatisfactory" and is not evidence that Plaintiff was qualified "as of the time" she was evaluated. *Nowak,* 142 F.3d at 1003; see also *Amadio*, 238 F.3d at 928 ("The facts relevant to a determination of whether a medical leave is a reasonable accommodation are the facts available to the decision-maker at the time of the employment decision."). Plaintiff has not created a triable issue of fact as to whether she is a "qualified individual," and summary judgment on Counts I and II is therefore appropriate.

### B. Failure to Accommodate

Because Plaintiff fails to establish that she is a qualified individual within the meaning of the ADA, the Court need not address the merits of her failure to accommodate claim. However, even if Plaintiff could show that she was a qualified individual, the Court would still grant summary judgment because Plaintiff has not shown that Defendant fell short of its ADA obligations by failing to provide her with a first floor single classroom accommodation.

"[A]n employee begins the accommodation 'process' by informing his employer of his disability." *James*, 707 F.3d at 783. "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic*, 201 F.3d at

899.  "After an employee's initial disclosure, the ADA obligates the employer to engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances."  *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005).  "[T]he failure to engage in the interactive process required by the ADA is not an independent basis for liability under the statute, and that failure is actionable only if it prevents identification of an appropriate accommodation for a qualified individual."  *Basden*, 714 F.3d at 1039.

"An employer is not obligated to provide an employee the accommodation [s]he requests or prefers, the employer need only provide some reasonable accommodation."  *Malabarba v. Chi. Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998) (citation and internal quotation marks omitted).  "[A]n employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee."  *Id.*  "Nor is an employer obligated to create a 'new' position for the disabled employee" or "promot[e] him or her to a higher level position."  *Id.*  "It is the employer's prerogative to choose a reasonable accommodation."  *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000).

According to Plaintiff, "Defendant failed to engage in the interactive process and failed to reasonably accommodate Plaintiff by providing her one classroom from which to teach so she could continue to perform her job duties."  [90, at 16.]  Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could not find that Defendant failed to "engage" with Plaintiff regarding her accommodations.  The undisputed evidence is that Defendant provided dozens of accommodations to Plaintiff, including dictation software, special computers and computer-related equipment, projectors, white boards, filing cabinets, a task chair, and air purifiers in each classroom where she worked.  Defendant provided Plaintiff with access to elevators as needed to enable Plaintiff to avoid using stairs.  Defendant reimbursed her for a cart

to move her teaching materials.  Defendant granted her 4 days per month of FMLA leave.  In late 2009, Defendant continued to discuss and provide accommodations to Plaintiff even without some of the required paperwork.  Defendant submitted requests to repair Plaintiff's accommodation laptop when it malfunctioned in early 2010.

This is simply not a case where a defendant "chose to turn a blind eye and terminate" the employee by disregarding her medical evaluations, *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014), or claimed its duty to accommodate is "exhausted by one effort," *Garcia-Ayala v. Lederle Parenterals*, Inc., 212 F.3d 638, 648 n.12 (1st Cir. 2000) (citation omitted), or where an employee's mental illness contributed to the breakdown of the interactive process, *Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1286 (7th Cir. 1996).  Plaintiff's acknowledgement that Defendant provided the "vast majority" of her accommodations shows that a reasonable jury could not find that Defendant "failed to * * * even engage in the interactive process to find out what she needed to work."  [90, at 17, 19]; see *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996) (affirming summary judgment where university "took numerous steps to accommodate [employee] based on information available to it," responded to employee's requests, and did not try to "sweep the problem under the rug").

Plaintiff's arguments encounter equal difficulty when they focus on the events surrounding Plaintiff's requests for one classroom at Corliss.  To start, Plaintiff admits that she "would have been satisfied" to work in a "regular education math position" even though "it was not a one-room setting."  [90, at 9.]  If so, it is hard to see why Defendant's failure to provide her with a one-room setting violates the ADA.  See *Lasisi v. Follett Higher Educ. Grp., Inc.*, 598 F. App'x 437, 442 (7th Cir. 2015) (Defendant "cannot be liable for refusing to [accommodate plaintiff] because he failed to justify the accommodation request with evidence of its

necessity.").[6]  To the extent that Plaintiff argues in her response that she "could have been given the one room accommodation in her CTT position" [90, at 20], she did not deny that under "the CTT model, the special education teacher *goes to different classrooms*" to teach students [80, ¶ 7; 92, at 3] and is deemed to have admitted that fact.  L.R. 56.1(b)(3)(C).  That is even how she describes the CTT position in *her* 56.1 statement.  [See 91, ¶ 9 (describing the CTT position and explaining, "Plaintiff was required to teach in different classrooms throughout the day").] Regardless, Plaintiff did not present evidence that she could have been accommodated as a one-room CTT teacher at Corliss in the 2009-2010 school year, and "the disabled employee retains the burden of showing that an accommodation existed."  *Doner v. City of Rockford, Ill.*, 77 F. App'x 898, 901 (7th Cir. 2003).

Furthermore, "when an employer takes an active, good-faith role in the interactive process, it will not be liable if the employee refuses to participate or withholds essential information."  *Sears*, 417 F.3d at 806.  Here, Plaintiff requested a one room accommodation on October 9, 2009, and Defendant responded the following day with a request that Plaintiff fill out a health care provider certification form.  [80, at Ex. D.]  Plaintiff did not submit that documentation or any physician note discussing her need for one classroom until June 15, 2010. For example, her January 21, 2010 doctor's note asked that she be able to "vary her seated/standing positions"—a request that does not suggest a need to work from one classroom only.  [80, at Ex. W, Attach. 1.]  The medical certification she submitted with her FMLA request focused on her difficulty with "prolonged walking, sitting, or standing."  It did not provide notice that the physical demands of walking the distance between two classrooms on the same floor required further accommodations.  Even the June 2010 doctor's note itself "lacked specific

---

[6] Plaintiff also argues that Defendant had not "effectively" accommodated her disabilities in the past [90, at 17–18], but she does not present any admissible evidence establishing that one classroom would have been any more effective.

details about what steps were necessary to reasonably accommodate [Plaintiff's] disability" beyond parroting Plaintiff's demand for a one-room accommodation. *Hoppe v. Lewis Univ.*, 692 F.3d 833, 841 (7th Cir. 2012). Likewise, Plaintiff did not show that she discussed her need for a one room accommodation at any of her 2010 disciplinary hearings. To the contrary, she explained at those hearings that her accommodations had caused her health to improve. [80, at Ex. E, Attachs. 6 & 7.] "The undisputed evidence in the record shows that [Plaintiff] did not provide the [Defendant] with the information it needed and requested and [Defendant] took reasonable steps even without this information to accommodate [Plaintiff's] disability. [Defendant] therefore is entitled to judgment as a matter of law." *Hoppe*, 692 F.3d. at 840.

Nor were Plaintiff's requests to teach from one room on the first floor at Washington and Brooks as a Cadre substitute required by the ADA. See *Filar*, 526 F.3d at 1067–68. Under the CBA, Cadre substitutes must be "continuously available to perform substitute service" and "accept all assignments in any and every school" as they became available. [91, at Ex. 11, Art. 27-1.1.] In *Filar*, the Seventh Circuit affirmed summary judgment on a Cadre substitute's ADA claims where a teacher requested reassignment to a specific subset of schools that would be "accessible" to public transit. The Seventh Circuit held that the teacher's requests were "not reasonable" because she was "in essence requesting to opt out of the cadre-assignment system; she only wanted 'one place to work' and not to be subjected to the far-reaching assignment system applicable to cadre substitutes." *Id.* at 1068. The same is true of Plaintiff, who declined to "accept all assignments in any way" and instead required a specific accommodation in one non-carpeted classroom on a school's first floor. As in *Filar*, Plaintiff was not "'available' as a substitute in the event that she was assigned to a school that did not fit her request" and "falls well short of the cadre substitutes' obligations." *Id.*

Similarly, Plaintiff fails to show that the one-classroom accommodation at Washington and Brooks "is reasonable in the sense both of efficacious and of proportional to costs." *Filar*, 526 F.3d at 1068 (citation and internal quotations omitted). Plaintiff does not offer any evidence to show that obligating Washington, Brooks, or any other school to change the schedules for 140 students (or 28 students in the five classes that Plaintiff taught per day) so that they could be directed to her classroom for the limited duration that Plaintiff taught as a substitute at these particular schools is either feasible or sensible. [102, at Ex. FF, ¶ 7.] The CBA provides that Cadre substitutes be "given the opportunity to apply to and be interviewed for vacant positions" and affords school principals discretion to select a member of the cadre to "fill an existing vacancy." *Filar*, 526 F.3d at 1068. Defendant could not "require a principal to take a particular cadre substitute," and lacked authority "to assign a cadre substitute" to a school with a first floor one room math position. *Id.* (holding that the "Board did not have the authority to assign a cadre substitute to 'one place to work'"); see also *Herr v. City of Chi.*, 479 F. Supp. 2d 834, 842 (N.D. Ill. 2007) ("[T]he ADA does not require an accommodation that would violate a Collective Bargaining Agreement"). In short, Plaintiff cannot show that providing a single classroom on the first floor for a Cadre substitute is a "reasonable" accommodation or that Defendant's failure to provide this accommodation to her at Washington or Brooks violated the ADA.[7]

Moreover, Plaintiff's claim that the ADA required Defendant to hire her as a permanent regular education math teacher at Washington is unavailing. "[A]n employer is not required to promote an individual with a disability as an accommodation." 29 C.F.R. Pt. 1630, App. § 1630.2(o) (2016); see also *Malabarba*, 149 F.3d at 700. A full-time position, with increased pay

---

[7] To the extent that Plaintiff brings her failure to accommodate claim based on her placement in a carpeted room at Brooks, she failed to present evidence that the principal at Brooks—a school where she worked at as a substitute for nine days—even knew about her need for this particular accommodation. See *James*, 707 F.3d at 783.

and benefits, would unquestionably have been a promotion from cadre status. In any event, both newly hired math teachers were assigned to two classrooms on two floors. Thus, hiring Plaintiff for one of these jobs would not have fit the accommodation that Plaintiff claims she "needed." [90, at 13.] Thus, Plaintiff has not established that Defendants' failure to hire her at Washington violated the ADA's reasonable accommodation provisions either.

Because Plaintiff fails to set forth specific facts showing a genuine issue for trial on her failure to accommodate claim, Defendant is entitled to summary judgment on Count I.

### C. Disability Discrimination

As with Plaintiff's failure to accommodate claim, the Court would still grant summary judgment on Plaintiff's disability discrimination claim (Count II) even if Plaintiff could prove she was a "qualified individual." "To establish disability discrimination, a plaintiff must prove that (1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of the job, either with or without a reasonable accommodation, and (3) she suffered from an adverse employment action because of her disability." *Hoppe*, 692 F.3d at 838–39. An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibility, or a decision causing a significant change in benefits." *Lewis v. City of Chi.*, 496 F.3d 645, 653 (7th Cir. 2007). Under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) framework, "[i]f an ADA plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the employment decision." *Hoppe*, 692 F.3d. at 839. "If the employer succeeds, then the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual." *Id.*

In *Ortiz v. Werner Enter. Inc.*, —F.3d—, 2016 WL 4411434 (7th Cir. Aug. 19, 2016), the Seventh Circuit eliminated the "direct" versus "indirect" evidence distinction from analysis of employment discrimination claims. *Ortiz* ordered that courts are to "stop separating 'direct' from 'indirect' evidence." *Id.* at *5. Instead, "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Id.* at *4. The "legal standard" that courts must apply "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's * * * proscribed factor caused the discharge or other adverse employment action." *Id.* The "sole question" that must be answered is "[w]hether a reasonable juror could conclude that [Plaintiff] would have kept [her] job if [s]he [was not disabled], and everything else had remained the same." *Id.* at *3.

As one court interpreting *Ortiz* in the ADA context explained,

*McDonnell Douglas* identifies one pattern that the evidence might fit that would enable a reasonable juror to find discrimination—namely, a pattern of evidence showing that the plaintiff belonged to a protected class, met her employer's legitimate expectations, suffered an adverse employment action, and was similarly situated to other employees who were not members of the protected class who were treated better, provided that the defendant fails to articulate a reasonable alternative explanation or the plaintiff shows that the proffered alternative explanation is a pretext. But the pattern identified in *McDonnell Douglas* is just one way that the record evidence could enable a reasonable juror to find discrimination. A district court must not limit its analysis to *McDonnell Douglas* or treat some evidence as relevant to the *McDonnell Douglas* analysis but not to the broader question whether "a reasonable factfinder [could] conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."

*Knapp v. Evgeros, Inc.*, 2016 WL 4720026, at *6 (N.D. Ill. Sept. 9, 2016). Accordingly, the Court will "see if the evidence, *considered as a whole*, fits the *McDonnell Douglas* pattern." *Id.* at *7. If it does not, "the court will step back and—again, *considering the evidence as a whole*—

29

determine whether a reasonable factfinder could conclude that [Plaintiff] was discriminated against." *Id.* If a reasonable factfinder could not, then summary judgment is appropriate.

Plaintiff alleges that "Defendant intentionally subjected Plaintiff to adverse employment actions, including but not limited to, effectively terminating Plaintiff's employment by failing to allow her to teach from one room, as non-disabled employees were allow to do." [21, ¶ 73.] In Plaintiff's response to summary judgement, Plaintiff appears to argue that the "adverse actions" she suffered "because of her disability" were (a) disciplinary actions in the 2009-2010 school year, (b) her assignment to the CTT position in November 2009, (c) her "unsatisfactory" rating in 2010, (d) her termination from Corliss, (e) her placement in the RTP (rather than being rehired at Corliss), (f) her failure to be hired at Washington to a full-time math position, and (g) her removal from the Cadre. [90, at 23–28.]

Plaintiff fails to present sufficient evidence such that a reasonable jury could conclude that she suffered disability discrimination on the basis of any of these actions, whether examined individually or as a whole. Regarding her discipline for attendance issues, the undisputed evidence is that Plaintiff was required to achieve a 98 percent attendance rate at Corliss, but "missed an inordinate amount of work" during the 2009-2010 school year. *Bunn v. Khoury Enterprises, Inc.*, 753 F.3d 676, 685 (7th Cir. 2014). "It seems self-evident that an employer is acting with a 'legitimate, nondiscriminatory reason' in terminating an employee who simply fails to report to work and does not adequately explain his absence." *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1114–15 (7th Cir. 1992); accord *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 862 (7th Cir. 2005). Plaintiff does not identify any similarly situated non-disabled employee who missed a similar amount of work but was treated more favorably, show that she was still meeting Defendant's legitimate expectations despite her absences, or present "a single shred of

evidence suggesting that [Defendant's] explanations [for her discipline] are lies." *Bunn*, 753 F.3d at 685. She thus fails to create a triable issue of fact regarding these disciplinary actions.

The same is true with respect to her CTT assignment. "In order for a plaintiff to file a suit under the ADA, the plaintiff must first file a charge with the EEOC within 300 days from when the alleged discrimination occurred." *Jordan v. City of Chi.*, 2016 WL 5171767, at *3 (N.D. Ill. Sept. 21, 2016). As a threshold matter, Plaintiff concedes that she cannot bring ADA claims that "encompass adverse actions" before January 12, 2010, because she filed her first EEOC charge of discrimination on November 8, 2010. [90, at 15]. Accordingly, there is no dispute that a discrimination claim based on her November 2009 CTT assignment is time barred. See *Stepney v. Naperville Sch. Dist. 203*, 392 F.3d 236, 240 (7th Cir. 2004) (affirming summary judgment despite allegations that discriminatory actions were a "continuing violation").

Even so, Plaintiff fails to show that her CTT assignment constitutes disability discrimination. According to Defendant, a need for a CTT teacher arose after the start of the school year and Plaintiff was one of the few teachers with a special education certification that was immediately available to fill that role. [80, ¶ 8.] Plaintiff did not deny that statement of fact [92, at 4], and therefore admitted it. See L.R. 56.1(b)(3)(C). She also fails to offer any evidence suggesting that Defendant's decision to assign her to a CTT position was pretextual or identify a similarly situated non-disabled employee—such as a non-disabled Corliss teacher with a special education certificate who could have served as a CTT teacher—who was treated more favorably than her. Assuming Plaintiff could show that this change to her schedule "objectively" created a hardship exposing her to an "unsafe, unhealthful" work environment sufficient to constitute an "adverse action," Plaintiff offers no evidence that she was transferred to the CTT position in 2009 because of her disability. *Cavanaugh v. Oshkosh Corp.*, 787 F. Supp. 2d 860, 865 (E.D.

Wis. 2011) (describing the "classic" case of objective hardship as cold or heat, extended hours, or humiliation, such as when an employee's desk is moved in a closet).

To the extent that Plaintiff argues more broadly that her failure to receive a one-room accommodation at Corliss, Washington, and Brooks was, itself, disability discrimination separate and apart from her failure to accommodate claim [90, at 25–28], Plaintiff neither offers evidence that discriminatory animus motivated the denial of this specific accommodation nor explains how Defendant's reasons for denying her a one-room accommodation (see *supra* III.B) were pretextual—especially in light of her acknowledgement that Defendant provided the "vast majority" of her other requested accommodations [90, at 17].  Although Plaintiff purports to identify other non-disabled employees who were permitted to teach from one classroom, she does not present evidence as to how these "similarly situated" employees were "directly comparable in all material aspects, including performance, qualifications, and conduct." *Bunn*, 753 F.3d at 685.  For example, Plaintiff identifies four general education math teachers at Corliss who taught from one classroom in the 2009-2010 school year, but fails to elaborate on how she was similarly situated to those teachers when she served as a CTT special education teacher. [90, at 8.]  The same is true for her time at Washington, where Plaintiff identifies a math teacher and another teacher with a disability, both of whom taught from one classroom.  Putting aside the fact that Washington's provision of one classroom to another teacher with a disability cuts *against* an inference that Plaintiff was denied the same accommodation because of her disability, Plaintiff fails to explain how a Cadre substitute whose presence at the school was only short term is similarly situated to full-time teachers at Washington.  "This inquiry is too fact-intensive for us to rely on conjecture alone," and Plaintiff cannot create a question of fact by completely failing to explain how these individuals were "satisfactory comparator[s]." *Bunn*, 753 F.3d at 685.

Nor are the events surrounding Plaintiff's "unsatisfactory" rating evidence of disability discrimination.[8]  Plaintiff either admits or is deemed to have admitted the facts surrounding Principal Spivey's May 13, 2010 observations of her classroom performance, including her failure to engage in instruction, apply contemporary principles of teaching, or support students in the classroom; her lack of a lesson plan; and her confrontation with another teacher.  [92, at 9–10]; *Malec*, 191 F.R.D. at 584.  Plaintiff was evaluated "unsatisfactory" based on seven "weaknesses," six of which were teaching deficiencies and one of which related to her attendance issues.  [80, at Ex. E, Attach. 13.]

Plaintiff fails refute any of the bases for her "unsatisfactory" evaluation.  While Plaintiff argues that Principal Spivey evaluated her according to an incorrect standard [92, at 9–12], she never explains how exactly she believes these standards differed.  And, even if they differed, that is irrelevant.  "This Court's concern is not the wisdom or fairness of the rating, but whether it was [Defendant's] honest appraisal of plaintiff's performance, rather than a product of or screen for discriminatory animus."  *Owens*, 2016 WL 4611387, at *6; accord *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("It is not the court's concern that an employer may be wrong about its employees performance, or may be too hard on its employee."); *Brill v. Lante Corp.,* 119 F.3d 1266, 1273 (7th Cir.1997) ("[T]he question is not whether the employer's performance ratings were *right* but whether the employer's description of its reasons is *honest.*" (internal quotations and punctuation omitted)).  The Court's "only question is whether the employer's proffered reason was pretextual, meaning that it was a lie."  *Coleman*, 667 F.3d at 852.  Plaintiff

---

[8] "A negative performance review is generally not an adverse action by itself * * * even if having a negative performance review on one's record makes a future adverse action more likely."  *Owens v. Bd. of Educ. of the City of Chi.*, 2016 WL 4611387, at *5 (N.D. Ill. Sept. 6, 2016).  If Plaintiff had presented evidence that Principal Spivey "gave plaintiff the unsatisfactory rating with discriminatory animus and with the *intent* to cause [her] termination, then—since [his] review, combined with the layoff, actually resulted in plaintiff's layoff—this might be a case in which the Board could be liable for laying off plaintiff based on [Principal Spivey's] actions."  *Id.* at *6.  Plaintiff fails to present such evidence.

must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the evaluation such "that a reasonable person could find [it] unworthy of credence." *Id.* Again, Plaintiff fails to do this. There is no evidence that the bases for Plaintiff's evaluation were untrue or motivated by discriminatory animus, especially considering that four other teachers who had not requested ADA accommodations received "unsatisfactory" ratings that year.

Because Plaintiff cannot show that her "unsatisfactory" rating was discriminatory, her arguments that her termination from Corliss, her placement in the RTP, and her removal from the Cadre were discriminatory fail as well. All of these actions were triggered by the "purely mechanical" terms of Plaintiff's CBA and the city-wide resolution regarding teacher layoffs. *Owens*, 2016 WL 4611387, at *6; [80, at Ex. O, Attach. 1; 91, at Ex. 11]. Following the terms of a collective bargaining agreement is "a legitimate, non-discriminatory reason for laying off plaintiff," assigning her to the RTP and as a Cadre substitute, and removing her from the RTP and Cadre substitute status after she served ten months in each position. *Owens*, 2016 WL 4611387, at *6. In fact, Plaintiff concedes that she "was chosen for layoff because she was in a position that lost population and Dr. Spivey had given her an 'unsatisfactory' rating for the 2009-10 school year"—reasons that are non-discriminatory. [91, ¶ 31.]

Plaintiff argues that "Defendant did not follow its procedures in taking those actions," pointing to the fact that she was reassigned to the RTP after she filed a grievance and secured a rating change in her 2011 settlement with Defendant. [90, at 27.] Assuming Plaintiff could overcome the fact that she released Defendant for "all claims … in connection with any of the allegations contained in the Grievance" as part of her settlement [91, at Ex. 60], a settlement agreement is not admissible as evidence of liability, see Fed. R. Evid. 408. Regardless, Plaintiff was restored to the RTP for reasons having nothing to do with her disability. Her restoration

related solely to the underlying reason that Corliss laid off two special education teachers in 2010: a reduced student population versus economic reasons. [101, at 3–4.] In any event, "potentially inaccurate evaluations [do not] necessarily denote *disability* discrimination," evidenced by the fact that, as far as the Court can tell, Plaintiff's original grievance did not raise disability discrimination allegations at all.[9] *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 603 (7th Cir. 2011); [102, at Ex. OO]. Because Plaintiff offers no evidence that her disability had anything to do with Defendant's straightforward application of the CBA, she has not created a genuine dispute of material fact sufficient to defeat summary judgment.

Plaintiff runs into a different challenge when it comes to her claim that she suffered disability discrimination by not being hired for a full-time math position at Washington. [90, at 27.] "A plaintiff is barred from raising a claim in the district court that had not been raised in his or her EEOC charge unless the claim is reasonably related to one of the EEOC charges and can be expected to develop from an investigation into the charges actually raised." *Green v. Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894, 898 (7th Cir. 1999). "[P]laintiff need not allege in an EEOC charge each and every fact that combines to form the basis of each claim in her complaint" as long as the "charge and the complaint * * *, at minimum, describe the *same conduct* and implicate the *same individuals*." *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 500–01 (7th Cir. 1994). "When an employer both discharges an employee and then fails to rehire that employee for another position, the employee has suffered two separate and independent adverse employment actions." *Mallett v. Bd. of Educ., City of Chi.*, 2005 WL 1563227, at *5 (N.D. Ill. July 5, 2005). "Because these two employment decisions are wholly independent, they cannot be reasonably related to one another." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th

---

[9] The parties do not appear to have included the grievance itself as part of the summary judgment record, but included a letter describing the violations alleged in the grievance. [102, at Ex. OO.]

Cir. 2000). "Thus, to properly maintain both a termination claim and a failure to rehire claim, plaintiffs must include both allegations in charges with the EEOC." *Id.*

After examining Plaintiff's 2012 EEOC charge, the Court concludes that Plaintiff's failure-to-rehire claims involving Washington are barred. Plaintiff's charge includes allegations that she was denied appropriate accommodations at Corliss [21, at Ex. 2, at 4], inappropriately terminated from Corliss by being placed in the RTP [*id.* at 4-5], and denied appropriate accommodations as a Cadre substitute [*id.* at 3, 5–7]. An alleged failure to accommodate Plaintiff while she was a Cadre substitute is not "reasonably related" to a failure-to-rehire claim. *Green*, 197 F.3d at 898 (7th Cir. 1999) (holding that "a failure to accommodate claim is separate and distinct from a claim of discriminatory treatment under the ADA" and "they are not like or reasonably related to one another"); *Oxman v. WLS–TV,* 12 F.3d 652, 660–61 (7th Cir.1993) (same); *Aberman v. Bd. of Educ. of City of Chi.*, 2014 WL 4912139, at *4 (N.D. Ill. Sept. 30, 2014) (same). Similarly, a claim that *Corliss* improperly terminated Plaintiff is not "reasonably related" to a claim that *Washington* failed to rehire her. See *Cheek*, 31 F.3d at 501. "Because [she] failed to bring that charge before the EEOC, the court is barred from hearing" her failure-to-rehire at Washington claims as a viable theory of disability discrimination. *Salvato v. Ill. Dep't of Human Rights*, 1997 WL 12793, at *3 (N.D. Ill. Jan. 10, 1997).[10]

Finally, taking a step back and viewing the evidence and Plaintiff's disability discrimination allegations as a whole outside the *McDonnell Douglas* framework does not

---

[10] Even if this allegation had been properly included in Plaintiff's EEOC charge, it still would not survive summary judgment. There is not sufficient evidence to show that Washington's principal—who has a disability [102, at Ex. FF, ¶ 5]—refused to hire Plaintiff because of her disability, rather than the fact that she was simply unaware that Plaintiff was even a candidate for this position. [80, ¶ 36.] Plaintiff's reliance on her own testimony that the *assistant* principal observed her teach math and the principal attended some math department meetings—whether these events were before or after the math positions were already filled, Plaintiff does not say—fails to create a genuine dispute of material fact on this allegation. [92, at 19–20.]

change the result. Plaintiff's only facts to avoid summary judgment are that she had several disabilities, did not receive a one-room accommodation despite receiving the "vast majority" of her other requested accommodations, and was disciplined, terminated, and not rehired to a full-time teaching position. The undisputed evidence amply supports legitimate, non-discriminatory explanations for all of these actions: Plaintiff regularly missed or was late to work, was rated unsatisfactorily based in substantial part on poor classroom performance unrelated to any attendance issues, and was terminated pursuant to a neutral city-wide policy regarding teacher lay-offs. She was reinstated to the RTP and served as a Cadre substitute according to the terms of the governing CBA—including with respect to the duration of those assignments. No reasonable juror could conclude that Defendant rated Plaintiff "unsatisfactory"—triggering her eventual termination—because she was disabled, rather than because she failed to meet the legitimate requirements of her job. Defendant is therefore entitled to summary judgment on Plaintiff's disability discrimination claim, Count II.

### D. Retaliation

Although the Court grants summary judgment on Plaintiff's discrimination and failure to accommodate claims, the viability of Plaintiff's retaliation claim does not turn on the viability of these underlying ADA claims. See *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690 (7th Cir. 2010) ("The fact that Turner is not disabled under the ADA is not fatal to his retaliation claim."). "The [ADA] prohibits an employer from retaliating against an employee who has raised an ADA claim, whether or not that employee ultimately succeeds on the merits of that claim." *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 786 (7th Cir. 2007). To prove her retaliation claim, Plaintiff must present evidence of "(1) a statutorily protected activity; (2) an adverse action; and (3) a causal connection between the two." *Id.* Plaintiff argues that the statutorily protected activities

at issue here are her charges of discrimination filed with the EEOC on November 8, 2010 and July 9, 2012.[11]  [90, at 28.]  The issue is whether Plaintiff can satisfy the second and third elements of her prima facie case.

Plaintiff argues that the "adverse actions" she experienced are the (1) "failure to accommodate her disabilities," (2) "her unsatisfactory rating," (3) "her layoff," (4) "the failure to reinstate her to a new position," and (5) "her removal from Cadre status."  *Id.*  Each of these candidates presents different obstacles for Plaintiff.

Plaintiff's first proposed adverse action is unavailing as a matter of law.  A "failure to accommodate" cannot serve as an adverse action for an ADA retaliation claim because it merely restates an underlying failure to accommodate claim.  See, *e.g.*, *Avet v. Dart*, 2016 WL 757961, at *6 (N.D. Ill. Feb. 26, 2016) (granting summary judgment because non-accommodation "cannot do 'double duty' as evidence of an adverse employment action"); *Pack v. Ill. Dep't of Healthcare & Family Servs.*, 2014 WL 3704917, at *4 (N.D. Ill. July 25, 2014) (dismissing plaintiff's ADA retaliation claim based on denials of accommodations as "duplicative"); *Imbody v. C & R Plating Corp.*, 2009 WL 196251, at *4 (N.D. Ind. Jan. 23, 2009) (dismissing ADA retaliation claim because "the mere denial of the accommodation claimed to violate the substantive anti-discrimination provisions of the ADA simply cannot support a retaliation claim").  As other courts have explained, such allegations are "circular" because "the denial of such requests can hardly be considered unlawful retaliation for the act of requesting them." *Sheahan v. Dart*, 2015 WL 1915246, at *6 (N.D. Ill. Apr. 23, 2015).  Otherwise, "almost every failure to accommodate claim would be simultaneously a retaliation claim" and "it was unlikely

<hr>

[11] Plaintiff's original 2010 EEOC charge [91, at Ex. 63] asserts that she was retaliated against for "having previously filed a charge of discrimination with the EEOC," referring to the EEOC charge against Defendant that she settled in 2004 [102, at Ex. PP].  Plaintiff did not plead that allegation in her First Amended Complaint [21, ¶¶ 79-87] or pursue it in response to Defendant's summary judgment motion [90, at 28-30].

Congress' intent to provide plaintiffs redundant relief for the same conduct when it established the anti-retaliation provisions of the ADA." *Pagliaroni v. Daimler Chrysler Corp.*, 2006 WL 2668157, at *9 (E.D. Wis. Sept. 15, 2006) (granting summary judgment).

Plaintiff's second and third candidates—her "unsatisfactory" rating and layoff—predate the filing of her November 2010 EEOC charge. Plaintiff was rated "unsatisfactory" on June 1. [80, at Ex. E, Attach. 13]. She was notified on July 20 that she would be honorably dismissed effective August 3. [91, at Ex. 53.] Plaintiff does not explain how these actions were retaliation for her subsequent EEOC charge, and thus cannot satisfy the third element of her prima facie case for these adverse actions.

That leaves Plaintiff's fourth and five candidates: "the failure to reinstate her to a new position" and "her removal from Cadre status." Plaintiff's argument that she was not "reinstate[d]" to a "new" position can be interpreted broadly to refer to the fact that she was placed in the RTP in 2010 instead of being *reinstated* as a full-time teacher at Corliss, and that she was not hired to fill either of the *new* math positions at Washington in 2011. According to Plaintiff, the failures to rehire her at Corliss in 2010 and hire her at Washington in 2011 were in retaliation for the November 2010 charge.[12] Likewise, she argues that her removal from Cadre status in August 2012 was in retaliation for her July 2012 charge.

"[T]o establish a causal connection for a claim of retaliation," temporal proximity alone is insufficient. See *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 549 (7th Cir. 2008). A plaintiff

---

[12] Defendant argues that Plaintiff's "failure to hire" *retaliation* claim is barred because it is beyond the scope of her 2012 EEOC charge [79, at 20–21], but "[a]n allegation of retaliation arising from an EEOC charge"—here, the 2010 EEOC charge—"will always satisfy the 'like or reasonably related test' where the retaliation allegedly arises from the complained of action." *Alerquin v. Gen. Fire Extinguisher Corp.*, 1995 WL 493446, at *5 (N.D. Ill. Aug. 15, 1995). Plaintiff was not required to "file a separate EEOC charge alleging retaliation from the first charge in order to preserve her ability to bring the retaliation claim" and Defendant does not cite any case law holding that Plaintiff's decision to file her 2012 EEOC charge, which omits this information, precludes her from pursuing relief for conduct that would otherwise satisfy the "reasonably related" test. *Id.*

must go beyond "[s]peculation based on suspicious timing" and "produce facts which somehow tie the adverse decision to the plaintiffs' protected actions." *Sauzek*, 202 F.3d at 918; *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 665 (7th Cir. 2006). Some "other circumstances must also be present which reasonably suggest that the two events are somehow related to one another." *Sauzek,* 202 F.3d at 918.

Plaintiff does not move beyond speculation here. Plaintiff's November 2010 EEOC charge was followed by Defendant's December 2010 decision to reinstate her (with back pay and benefits) to the RTP. Plaintiff offers no evidence that Defendant did not return her to Corliss because of her EEOC filing or that it was even possible to return her to Corliss. Rather, the only record evidence indicates that Defendant placed Plaintiff back in the RTP because the governing collective bargaining agreement afforded her this benefit once it was determined that Corliss' 2010-2011 special education teacher budget was reduced because of a reduction in student population. In 2010, Plaintiff still had an unsatisfactory rating. Her rating was changed to "no rating" only when she settled her August 2010 grievance against Defendant in February 2011, at which point she agreed to release "all claims and causes of action" against Defendant related to her grievance. [91, at Ex. 60.] Plaintiff's reinstatement to Corliss was not a term of this settlement agreement and, thus, the failure to go above and beyond what was required under the settlement agreement and reinstate her to a full-time position at Corliss is neither suspicious nor evidence of a causal connection sufficient to prove retaliation.

Similarly, Plaintiff fails to offer any facts showing that Defendant's failure to hire Plaintiff for a math position at Washington in September 2011 was in retaliation for her November 2010 EEOC charge. Courts have regularly held that time gaps of this duration are insufficient by themselves to show a causal connection. See, *e.g.*, *Yellow Freight Sys.,* 253 F.3d

at 952–53 (affirming summary judgment in part because a six-week gap between filing of EEOC charge and termination was insufficient to establish retaliation); *Jasmantas v. Subaru–Isuzu Auto., Inc.,* 139 F.3d 1155, 1158 (7th Cir. 1998) (affirming summary judgment because a three-month gap between the filing of the EEOC charge and employee's discharge was insufficient); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 481 (7th Cir. 2010) (affirming summary judgment because "a year is too long in the absence of any other evidence tying the protected activity to the adverse action").[13]

More problematic for Plaintiff, however, is the fact that she does not present any evidence that Principal Gonzales was aware of her November 2010 EEOC charge when Plaintiff was not hired for permanent positions at Washington. An employer "must have had actual knowledge of the complaints for [its] decisions to be retaliatory." *Luckie v. Ameritech Corp.,* 389 F.3d 708, 715 (7th Cir. 2004); accord *Nagle v. Vill. of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009). "[I]f an employer did not know the plaintiff made any complaints, it cannot be trying to penalize [her] for making them." *Tomanovich,* 457 F.3d at 669. The record does not identify anyone other than Principal Gonzales involved in recommending teachers for hire at Washington in 2011. [102, at Ex. FF, ¶ 2.] Without evidence that Principal Gonzales knew about Plaintiff's November 2010 EEOC charge, there is no evidence from which a rational trier of fact could find that Defendant retaliated against Plaintiff for this statutorily protected activity by failing to hire her at Washington. See, *e.g., Ferguson v. City of Chi.*, 2015 WL 5996332, at *14 (N.D. Ill. Oct. 13, 2015) (granting summary judgment); *Love v. Cmty. Nutrition Network*, 2010 WL 5185089, at *5 (N.D. Ill. Dec. 16, 2010) (same).

---

[13] Plaintiff does not avoid the obligation to present actual evidence at the summary judgment stage by relying on cases discussing the requirements for pleading a claim of "ongoing" retaliation at the motion to dismiss stage. [See 90, at 28–29 (discussing *Carlson v. CSX Transp., Inc.*, 758 F.3d 819 (7th Cir. 2014)).]

Plaintiff's claim of retaliation for being removed from Cadre status fares no better. Defendant sent Plaintiff a letter on August 3, 2012—a month after her second EEOC charge was filed—stating "your assignment to the Cadre has exceeded the number of months for which you are eligible under the Chicago Teachers Union collective bargaining agreement." [91, at Ex. 71.] Defendant submitted a declaration from Piper Haywood, an Employment Specialist in Defendant's Talent Department, stating that the collective bargaining agreement "provided a cadre substitute would remain in the cadre pool for 10 school months and that at the end of that time period, had she not found employment, she would be honorably terminated form her cadre status and enrolled in the Board's day-to-day substitute pool." [80, at Ex. Q, ¶ 4.] Plaintiff received at least that much time in the Cadre pool: she entered the Cadre pool as of June 24, 2011, and was terminated from the Cadre effective August 31, 2012.

Plaintiff offers no reason to believe—let alone evidence establishing—that she was entitled to more time in the Cadre pool than Defendant provided under the CBA or otherwise.[14] See *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 884 (5th Cir. 2003) (holding that application of a "general policy" was not retaliation); *Shaner v. Synthes*, 204 F.3d 494, 507 (3d Cir. 2000) (holding that application of a "neutral policy" was not retaliation). Nor does she offer "evidence that the [agreement] was applied inconsistently or that others were treated more favorably than [s]he was." *Silk v. City of Chi.*, 194 F.3d 788, 800 (7th Cir. 1999). Thus, Plaintiff fails to present any evidence by which a reasonable jury could find that Defendant retaliated

---

[14] Section D of Appendix H for the CBA that became effective July 1, 2012 states that "tenured teachers * * * shall be assigned to the Cadre for ten school months." See Agreement Between the Bd. of Educ. of the City of Chi. and Chi. Teachers Union Local 1, Am. Fed'n of Teachers, AFL-CIO (effective July 1, 2012), http://www.ctunet.com/for-members/text/CTU_Contract_As_Printed_2012_2015.pdf (last visited Sept. 29, 2016). Although clearer than the prior version of the CBA [see 91, at Ex. 11], Plaintiff offers no reason to believe that the policies applicable to Cadre substitutes differed under either version of the agreement or that interpretation of this agreement presents a disputed question of material fact for resolution by a jury.

against her by removing her from the Cadre pursuant to the CBA. See *Ratliff v. City of Chi.*, 2002 WL 2022188, at *11 (N.D. Ill. Aug. 29, 2002) (granting summary judgment on ADA retaliation claims where plaintiff was terminated pursuant to provisions of a collective bargaining agreement even though the termination came three days after plaintiff requested an accommodation under the ADA).

Accordingly, summary judgment on Count III for Retaliation is also proper.

**IV.    Conclusion**

For the foregoing reasons, Defendant's motion for summary judgment [99] is granted. Judgment will be entered in favor of Defendant and against Plaintiff, and the case will be closed.

Dated: September 29, 2016

_____
Robert M. Dow, Jr.
United States District Judge